UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| LISA GREVLOS and PAUL NESHEIM,<br><br>Plaintiff,<br><br>vs.<br><br>AUGUSTANA UNIVERSITY,<br><br>Defendant. | 4:23-CV-04086-KES<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART AUGUSTANA'S MOTION TO DISMISS, GRANTING LEAVE FOR PLAINTIFFS TO AMEND COMPLAINT, DENYING AUGUSTANA'S MOTION FOR MORE DEFINITIVE STATEMENT, AND GRANTING AUGUSTANA'S MOTION TO STRIKE/DISMISS CERTAIN ALLEGED DAMAGES |

Plaintiffs, Dr. Lisa Grevlos and Dr. Paul Nesheim, sued defendant, Augustana University, alleging Augustana (1) illegally terminated their employment under various federal anti-discrimination statutes and (2) breached the contract each of them had with Augustana. *See* Docket 1. Augustana moves to dismiss plaintiffs' complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6), or in the alternative, moves to require plaintiffs to submit a more definitive statement under Rule 12(e). Docket 12. Augustana also moves to strike and dismiss certain damages requested by plaintiffs. *See* Docket 13 at 25-26. After considering the parties' arguments, the court issues the following order.

I.     **Facts**

Plaintiffs allege the following in their complaint:

Dr. Grevlos and Dr. Nesheim were tenured faculty members in Augustana University's School of Music. Docket 1 ¶ 1. Dr. Grevlos taught at Augustana for thirty years and was a tenured faculty member for seventeen years. *Id.* ¶ 8. While Dr. Grevlos was a tenured faculty member, Augustana appointed her to be the Director of Vocal Studies in 2010, promoted her to full professor in 2015, appointed her to be the Director of the Augustana Summer Music Camp in 2017, and appointed her to be the Chair of the Music Department/School of Music in 2018. *Id.* ¶ 9. In her evaluations, Dr. Grevlos was "found to be highly competent and excellent in her work, scholarship, and service as a music faculty member" and she received various state, regional and national recognitions and awards. *Id.* ¶ 10. As of May 26, 2023, Dr. Grevlos was 58 years of age. *Id.* ¶ 12.

Dr. Nesheim began working as a professor at Augustana in 2012. *Id.* ¶ 14. In 2015, Augustana granted Dr. Nesheim tenure and promoted him to full professor, and in 2017, Augustana appointed him to be the Director of Choral Activities for the Music Department/School of Music. *Id.* Like Dr. Grevlos, Dr. Nesheim was evaluated "to be highly competent and excellent in his work, scholarship, and service as a music faculty member" and he received various state, regional and national recognitions and awards. *Id.* ¶ 16. As of May 26, 2023, Dr. Nesheim was 62 years of age. *Id.* ¶ 17.

On May 27, 2020, Augustana announced the selection of Dr. Peter Folliard as the Dean of the School of Music. *Id.* ¶ 24. Sometime between September 2020 and March 2021, Dr. Folliard had a series of scheduled

meetings with Dr. Russell Svenningsen. *Id.* ¶ 31. Dr. Folliard and Dr.

Svenningsen, both males, excluded Dr. Grevlos, a female, from these scheduled

meetings so that they could engage in "real talk." *Id.* Dr. Folliard also told Dr.

Nesheim that including Dr. Grevlos could make the meetings "emotional." *Id.*

On April 6, 2021, Dr. Grevlos filed a Title IX complaint alleging

discrimination and retaliation by Dr. Folliard and Dr. Svenningsen. *Id.* ¶ 35.

Dr. Grevlos also told Augustana officials that Dr. Nesheim would be a witness

for her. *Id.* Three days later, on April 9, 2021,[1] Augustana removed Dr. Grevlos

from the positions of Department Chair, Director of Vocal Studies, and Director

of the Augustana Summer Music Camp. *Id.* ¶ 39. Augustana also reduced Dr.

Grevlos's salary. *Id.* Augustana used Dr. Grevlos's annual salary, based on 29

years of teaching, as a basis to change her teaching load and remove students

from her courses, while younger, male colleagues' teaching loads stayed the

same. *Id.* ¶ 40. Additionally, Dr. Folliard appointed Dr. Svenningsen to Dr.

Grevlos's position as the Director of Vocal Studies. *Id.* ¶ 41. Augustana

---

[1] The complaint states that "three days later," (from April 6, 2021), "Dr. Folliard
*began* the process to remove Drs. Nesheim and Grevlos from their various
titles, positions, and teaching loads." Docket 1 ¶ 36 (emphasis added). After
this paragraph, the complaint sets forth various instances of Dr. Folliard
allegedly removing Dr. Nesheim and Dr. Grevlos from various positions. *See id.*
¶¶ 37-41. Thus, it is not entirely clear which precise days Dr. Folliard allegedly
removed these professors. But the court must construe the complaint's well-
pleaded facts in the light most favorable to plaintiffs. *Faulk v. City of St. Louis*,
30 F.4th 739, 744 (8th Cir. 2022). Thus, the court construes the complaint as
alleging that Dr. Folliard removed Dr. Grevlos and Dr. Nesheim from the
various positions on April 9, 2023, because this date is the closest date to April
6, 2023, the date Dr. Grevlos allegedly filed her Title IX complaint with
Augustana.

eliminated the Augustana Summer Music Camp previously led by Dr. Grevlos and established separate summer camps in 2022. *Id.* Augustana appointed younger, male faculty to lead these new, separate summer camps. *Id.*

Also on April 9, 2021, Augustana removed Dr. Nesheim as Director of Choral Studies and Artistic Director of Vespers. *Id.* ¶ 37. Dr. Folliard replaced Dr. Nesheim as Artistic Director of Vespers. *Id.* Prior to Dr. Nesheim's removal as artistic director of Vespers, Dr. Folliard told Dr. Nesheim that anonymous leaders described Vespers as "tiring" and that Dr. Svenningsen called Vespers "old-fashioned." *Id.* ¶ 38.

In July 2021, Dr. Grevlos learned that her Title IX complaint would not proceed and that her concerns would be sent to Augustana's Provost, Colin Irvine. *Id.* ¶ 42. In September 2021, after Dr. Grevlos repeatedly requested her Title IX report, Augustana gave it to her. *Id.* ¶ 43. On November 12, 2021, during a meeting that Provost Irvine and Vice President of Human Resources Deanna Versteeg had with Dr. Grevlos, Provost Irvine threatened to dismiss Dr. Grevlos if Dr. Grevlos continued her "pattern of discontent," referring to her Title IX complaint.[2] *Id.* ¶ 44. Dr. Grevlos was also told that her complaints were "problematic." *Id.* ¶ 45. [3]

---

[2] The complaint specifically alleges that Provost Irvine referred to Dr. Grevlos's "complaints regarding her treatment by Drs. Folliard and Svenningsen." Docket 1 ¶ 44. Because the court must view the complaint in the light most favorable to Dr. Grevlos, the court assumes that the complaint alleges that Provost Irvine referred to Dr. Grevlos's Title IX complaint. *See Faulk*, 30 F.4th at 744.

[3] The complaint does not specifically state who said Dr. Grevlos's complaints were "problematic." *See* Docket 1 ¶ 45. At this stage, the court must view the complaint in the light most favorable to Dr. Grevlos, and thus assumes for now

On November 19, 2021, Dr. Grevlos filed a complaint with the U.S. Office of Civil Rights (OCR) regarding Provost Irvine's threat and the way Dr. Folliard and Dr. Svenningsen continued to treat her. *Id.* ¶ 46. On January 4, 2021, Dr. Nesheim also filed a complaint with the OCR regarding the way Dr. Folliard and Svenningsen treated him and his related support of Dr. Grevlos and participation as a witness in her Title IX complaint. *Id.* ¶ 47.

A year later, in January 2022, the OCR referred Dr. Grevlos's and Dr. Nesheim's complaints to the EEOC and notified Augustana of such referrals. *Id.* ¶ 49. On February 25, 2022, Dr. Folliard removed Dr. Nesheim as conductor of the Augustana Choir and replaced Dr. Nesheim with Dr. Svenningsen. *Id.* ¶ 50. On that same day, Dr. Folliard removed Dr. Grevlos as conductor of the Angelus Choir and Director of Opera Theatre, which resulted in removing her from the choral area entirely. *Id.* Dr. Folliard assigned Dr. Nesheim to conduct the Angelus Choir. *Id.*

In June 2022, Dr. Grevlos and Dr. Nesheim had to refile their charges with the EEOC due to OCR making a mistake in referring Dr. Grevlos's and Dr. Nesheim's original complaints. *Id.* ¶ 51. On February 24, 2023, Dr. Grevlos and Dr. Nesheim requested a notice of right to sue from the EEOC. *Id.* ¶ 66. Three days later, on February 27, 2023, the EEOC notified Augustana of these requests. *Id.* ¶ 68. That same day, on February 27, 2023, President Stephanie Herseth Sandlin issued a dismissal for cause letter terminating Dr. Nesheim.

---

that a relevant decisionmaker from Augustana made this comment. *See Faulk*, 30 F.4th at 744.

*Id.* ¶ 69. A week later on March 3, 2023, President Herseth Sandlin issued a dismissal for cause letter terminating Dr. Grevlos. *Id.* ¶ 70.

Dr. Nesheim and Dr. Grevlos filed grievances with Augustana's Faculty Grievance Committee (FGC) regarding their terminations. *Id.* ¶ 72. The FGC held a grievance hearing and issued its findings in support of Augustana dismissing both Dr. Nesheim and Dr. Grevlos. *Id.* ¶ 73-74. President Herseth Sandlin's termination decisions became effective for Dr. Grevlos and Dr. Nesheim on May 24, 2023. *Id.* ¶¶ 69-70. In terminating Dr. Grevlos and Dr. Nesheim, plaintiffs allege that Augustana failed to follow several procedures set forth in Augustana's Faculty Handbook, such as failing to give them reasonable time to remedy any issues, failing to provide them a statement of reasons for termination based on evidence, failing to provide them a statement of charges, and failing to demonstrate that their termination was for cause. *Id.* ¶¶ 134-35.

## II.   Discussion

### A. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff's claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing

6

*Twombly*, 550 U.S. at 556). To determine whether each allegation is plausible, the court must read the complaint "as a whole, not parsed piece by piece . . . in isolation[.]" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). The court must construe the complaint's well-pleaded allegations in the light most favorable to plaintiffs. *See Faulk*, 30 F.4th at 744.

At the motion to dismiss stage in discrimination claims, "[i]t is not appropriate to require a plaintiff to plead facts establishing a prima facie case." *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). At the same time, the elements of the prima facie case are still relevant because they "are part of the background against which a plausibility determination should be made." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (quotation omitted). Thus, "the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim." *Id.* At this stage, the ultimate inquiry is whether "the complaint . . . include[s] sufficient factual allegations to provide the grounds on which the claim rests." *Id.* at 1056 (emphasis omitted) (quoting *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009) (en banc)).

### 1. Materials the Court Considers

The parties first dispute which materials the court may consider at this stage in the litigation. Augustana argues the court can consider the FGC findings for Grevlos and Nesheim, as well as the Faculty Handbook, without converting plaintiffs' motion to one under summary judgment. *See* Docket 13 at 3-4; Docket 19 at 3-6. Plaintiffs argue otherwise. *See* Docket 18 at 3-5.

7

Although Federal Rule of Civil Procedure 12(d) requires that Rule 12(b)(6) motions containing materials outside of the pleadings be converted into motions for summary judgment, the court may "consider 'those materials that are necessarily embraced by the pleadings.' " *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 998 (8th Cir. 2016) (quoting *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014)); *see also Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). "[M]aterials embraced by the complaint include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings.' " *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)). Additionally, courts may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[.]" *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

Importantly, unless a court elects to convert a motion to one for summary judgment, a court may not consider "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 688 (8th Cir. 2003) (BJC I) (quoting *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992)); *see also* 5C Charles Alan

8

Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (3d ed. 2023) (providing that conversion to summary judgment is necessary when considering "any written or oral evidence introduced in support of or in opposition to the motion challenging the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings"). As the Eighth Circuit recognized in *Gibb*, "a 12(b)(6) motion will succeed or fail based upon the allegations contained in the face of the complaint." 958 F.2d at 816. "[T]he court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003) (quotation omitted).

Turning to the FGC findings, Augustana argues that the court can consider these documents because plaintiffs referenced them in their complaint and because they are central to plaintiffs' claim. *See* Docket 19 at 3-5. Augustana correctly notes that plaintiffs referenced the FGC findings in the complaint. *See* Docket 1 ¶ 74. Specifically, plaintiffs alleged in their complaint that the FGC held a hearing on May 5, 2023, and that on May 10, 2023, "the FGC issued their findings in support of the dismissals for cause of Dr. Grevlos and Dr. Nesheim." *Id.* ¶¶ 73-74. Plaintiffs relatedly alleged Augustana's proffered reasons for terminating them were pretextual. *Id.* ¶ 95.

But merely referencing the existence of a document, without alleging the specific contents, is not enough for the documents to be necessarily embraced by the complaint or incorporated by reference. *See Coto Settlement v. Eisenberg*,

9

593 F.3d 1031, 1038 (9th Cir. 2010) ("[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document."). Rather, the focus is on the contents of the plaintiffs' complaint. *See Zean*, 858 F.3d at 526 (defining "materials embraced by the complaint" to include "documents whose *contents* are alleged in a complaint and whose authenticity no party questions[.]" (quoting *Ashanti*, 666 F.3d at 1151) (emphasis added)); *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) ("When deciding a motion to dismiss, a court may consider the complaint and documents whose *contents* are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." (emphasis added) (quoting *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)); *Hodges v. S.D. Sch. of Mines and Tech.*, 647 F.Supp.3d 761, 768-69 (D.S.D. 2022) (refusing to consider contract of employment in non-breach of contract claim because, although plaintiff referenced existence of contract, "the contract [was] not attached to the complaint and nowhere in the complaint d[id] [plaintiff] allege the *contents* of the employment contract." (emphasis added)).

Here, although plaintiffs referenced the FGC findings, they did not allege the specific contents of such findings other than that they were "issued in support of the dismissal for cause of Dr. Grevlos and Dr. Nesheim." Docket 1 ¶ 74. At this motion to dismiss stage, considering the specific findings would be inappropriate because Augustana offers them to oppose plaintiffs' factual allegations in their complaint, and such findings would "provide[] some substantiation for [Augustana's opposition] and [would] not merely reiterate

what is said in the pleadings." *BJC I*, 348 F.3d at 688 (quoting *Gibb*, 958 F.2d at 816); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (3d ed. 2023).

Furthermore, plaintiffs did not attach the FGC findings to the complaint, and such matters are not matters of public record. *See Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 990 (8th Cir. 2007) (recognizing courts "may consider documents attached to the complaint and matters of public and administrative record referenced in the complaint"). Nor are these decisions "integral" to plaintiffs' claims. Contrary to Augustana's suggestion, plaintiffs' claims do not "seek[] to overturn [the FGC findings]" because, although such findings are related and relevant evidence to plaintiffs' claims, plaintiffs directly challenge whether Augustana illegally terminated them, not whether the FGC committee erred in its findings. Because plaintiffs do not heavily rely on the FGC findings in their complaint, the decisions are not integral. *See, e.g., Rosa v. MiTek Inc.*, 2021 WL 5371251, at *3 (E.D. Mo. Nov. 18, 2021) (quoting *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020)) (stating that "a document is 'integral' when the complaint 'relies heavily upon [the document's] terms and effect.' "); *see also Peacock v. AARP, Inc.*, 181 F.Supp.3d 430, 434 (S.D. Tex. 2016) (setting forth similar test that district courts in Fifth Circuit use for determining whether a document is central to a plaintiff's claim). Thus, the court exercises its discretion and does not consider the contents of the FGC findings in deciding plaintiffs' claims.

Determining whether to consider the Faculty Handbook, however, requires its own analysis. Unlike the FGC findings, plaintiffs extensively reference and quote the Faculty Handbook in support of their breach of contract claims. *See* Docket 1 ¶¶ 125-33. In fact, plaintiffs allege this Faculty Handbook is itself the contract between them (as tenured faculty) and Augustana. *Id.* ¶ 125. "In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss." *Stahl*, 327 F.3d at 700; *see also Nebauer v. FedEx Corp.*, 849 F.3d 400, 403 (8th Cir. 2017) (recognizing that courts may consider contracts attached to defendant's motion to dismiss because plaintiff's claim rested on such contracts); *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 876 (8th Cir. 2010) (stating that where the "claims [of the complaint] relate to a written contract . . . [courts may] consider the language of the contract when reviewing the sufficiency of the complaint"); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003) (observing that a contract "upon which [a] claim rests . . . [is] evidently embraced by the pleadings.").

Nevertheless, plaintiffs argue the court cannot consider the Faculty Handbook. *See* Docket 18 at 4. In support, plaintiffs cite *BJC I. Id.* In *BJC I*, an insurance company provided insurance to BJH Health System's sole shareholder for two years (1998 and 1999) at a fixed premium. *See* 348 F.3d at 686-87. Each year of issuance, the shareholder and insurance company entered into contracts. *Id.* BJC eventually sued the insurance company for the increased insurance premium that the insurance company issued for 2000,

alleging that BJC had entered into a separate contract with the insurance company guaranteeing a fixed-premium rate for 2000. *See id.* at 687. The insurance company filed a motion to dismiss under Rule 12(b)(6), attaching three documents: the 1998 and 1999 reinsurance agreements between the shareholder and the insurance company, and a reinsurance quotation letter from the insurance company. *See id.* The district court referred to both documents in its order to dismiss without converting the motion to dismiss to a summary judgment motion. *See id.*

The Eighth Circuit found the district court erred in considering the documents submitted by the insurance company. *See id.* at 688. Significantly, in that case, there was a factual dispute over whether the documents the insurance company submitted were actually the documents forming the basis for the plaintiffs' breach of contract claim. *See id.* ("The [three submitted] documents may or may not be the only legal agreements relevant to [plaintiffs'] alleged contract with [insurance company], and their significance is disputed."). The court specifically recognized that although a "plaintiff must supply any documents upon which its complaint relies, and if the plaintiff does not provide such documents the defendant is free to do so[,]" the situation before the court was different because the plaintiffs "alleged the existence of a contract, not a specific document[.]" *Id.*

Dr. Grevlos and Dr. Nesheim seize on language in *BJC I*, which in turn stated that the district court erred in considering the documents submitted by the insurance company because such documents "were neither undisputed nor

13

the sole basis for [the insurance company's] complaint." *See id.*; Docket 18 at 3-4. Thus, according to Dr. Grevlos and Dr. Nesheim, this court cannot consider the Faculty Handbook because the Handbook "is not the sole basis of Plaintiffs' complaint and Plaintiffs dispute the facts and inferences Defendant attempts to establish through its inclusion." Docket 18 at 4. Plaintiffs appear to argue that because they rely on additional evidence to support their breach of contract claim beyond the complaint, that means that the Handbook is not the "sole basis" of the plaintiff's breach of contract claim.

But plaintiffs misread *BJC I*. In *BJC I*, the court was concerned with the documents submitted by the insurance company because such documents may not have been the sole basis of BJC's breach of contract claim. 348 F.3d at 688. *BJC I* simply states that it is improper for a district court to consider documents submitted by a defendant when such documents are not indisputably the contract that the plaintiff alleges the defendant breached. *See id.* But *BJC I* does not stand for the proposition that anytime a plaintiff relies on evidence other than the contract to establish a breach of contract claim, that such reliance necessarily means the contract cannot be considered. If that were true, courts would never be allowed to consider contracts because, by definition, a breach of a contract cannot occur without external evidence showing such contract was actually breached. That result is not the law. *Stahl*, 327 F.3d at 700.

To the extent plaintiffs argue that the Handbook is not the "sole basis" of their complaint because they set forth multiple counts (and not simply a

14

breach of contract claim), this reading also improperly conflates the phrase "sole basis for the complaint." The phrase "sole basis for the complaint," as used in *BJC I*, does not refer to an instance where plaintiffs have pleaded additional claims other than a breach of contract claim. Rather, *BJC I* used this phrase specifically in reference to a situation in which the document at issue may not have been the actual contract in dispute. *See* 348 F.3d at 688. The fact that plaintiffs have alleged other claims in addition to a breach of contract claim does not suddenly require the court to ignore a document that is indisputably the contract at issue when determining whether plaintiffs' breach of contract claims survive. *See Neubauer*, 849 F.3d at 402-03, 405-06 (considering plaintiffs' contract when evaluating breach of contract claims despite the plaintiffs' other claims).

Here, the Faculty Handbook is indisputably the contract at issue. *See* Docket 1 ¶¶ 125-36 (alleging Augustana breached Faculty Handbook). Augustana has included the contract at issue and argued that the contract's terms foreclose plaintiffs' ability to recover. *See* Docket 12 at 17-23. This argument is precisely the kind of argument permitted in a breach of contract claim at the motion to dismiss stage. *See M.M. Silta*, 616 F.3d at 876 (noting that where the "claims [of the complaint] relate to a written contract . . . we consider the *language of the contract* when reviewing the sufficiency of the complaint[]" (emphasis added)). Finally, although plaintiffs state that they "dispute the facts and inferences [Augustana] attempts to establish through [the Faculty Handbook's] inclusion," they fail to elaborate as to which of the

15

facts they are referring. Docket 18 at 4. The court considers the Faculty Handbook in deciding plaintiffs' breach of contract claims.

### 2. Retaliation

Employers may not discriminate against their employees for opposing any unlawful employment practice. 42 U.S.C. § 2000e-3(a); *see also Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010). To prove a prima facie case for retaliation, a plaintiff must show (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) a causal connection exists between the two. *Wilson*, 850 F.3d at 372.

Augustana does not challenge the first two elements as to either Dr. Grevlos or Dr. Nesheim—namely that both engaged in statutorily protected conduct and suffered adverse employment actions. *See* Docket 13 at 12-15 (challenging only plaintiffs' ability to establish requisite causal connection). Based on the court's review of plaintiffs' complaint, both plaintiffs sufficiently pleaded facts to meet the first two elements. Dr. Grevlos alleged that she filed a discrimination and retaliation complaint under Title IX and filed a complaint with the OCR, re-filed the OCR complaint with the EEOC, and requested the EEOC to issue a right to sue. *See* Docket 1 ¶¶ 35, 46, 51, 66. Similarly, Dr. Nesheim alleged that he participated as a witness for Dr. Grevlos's Title IX complaint, filed a complaint with OCR, and refiled the OCR complaint with the EEOC. *See id.* ¶¶ 35, 47, 51. All of these actions constitute a statutorily

16

protected activity. *See* 42 U.S.C. § 2000e-3(a); *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008).

With respect to the second element, Dr. Grevos alleges that Augustana removed her from being the Department Chair, Director of Vocal Studies, Director of the Augustana Summer Music Camp, Conductor of the Angelus Choir, Director of Opera Theatre, reduced her salary, and ultimately terminated her. *See* Docket 1 ¶¶ 39, 50, 70. Similarly, Dr. Nesheim alleges that Augustana removed him from being the Director of Choral Activities, Artistic Director of Vespers, and Conductor of the Augustana Choir, suspended him, and ultimately terminated him. *Id.* ¶¶ 37, 62, 69.  All of these actions alleged by Dr. Grevlos and Dr. Nesheim constitute adverse employment actions. *See Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014) ("termination, cuts in pay or benefits, and changes that affect an employee's future career prospects" constitute adverse employment actions); *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804-05 (8th Cir. 2013) (job duty changes and responsibility changes constitute adverse employment actions).

The court turns to Augustana's argument that neither Dr. Grevos nor Dr. Nesheim can satisfy the causation requirement. *See* Docket 13 at 12-15. To prove the requisite causal link between an employee's protected activity and the adverse employee action, plaintiffs must prove that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). In other words, it is not enough to show that an

employee's protected activity was merely a "motivating factor" in an adverse employment action, but rather such activity must be a "but-for" cause of the adverse action. *See Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739-40 (8th Cir. 2017). To meet this heightened showing, plaintiffs may allege that the employer took an adverse employment action shortly after engaging in a protected activity. *See Wilson*, 850 F.3d at 374; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015).

The court will examine whether each plaintiff sufficiently pleaded causation separately.

### a. Dr. Grevlos

Augustana argues that the time between Dr. Grevlos's alleged protected activity and termination is too great for Dr. Grevlos to satisfy the causation requirement. *See* Docket 13 at 15.[4] Specifically, Augustana points out that it terminated Dr. Grevos on March 3, 2023, and that this termination "occurred 22 months after she filed her Title IX complaint, 15 months after she allegedly filed a complaint with the OCR, and approximately 9 months after she filed her EEOC charge." *Id.* (citing Docket 1 ¶¶ 35, 46, 51, 70). The gap in time between termination and one of these protected activities, alone, may be insufficient. *See, e.g.*, *Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 25 (1st Cir.

---

[4] Augustana also argues that the FGC findings show an obvious alternative explanation for both adverse employment actions suffered by Dr. Grevlos and Dr. Nesheim, *see* Docket 13, but the court does not consider this argument because it does not consider the contents of the FGC findings as discussed above.

2014) ("We do not rule out that some pleadings may allege a temporal gap so attenuated as not to meet the plausibility standard for surviving motions to dismiss[.]").

But here, Dr. Grevlos's pleadings, taken as a whole, show that she has plausibly alleged the requisite causal link between her protected activity and the adverse employment action. *See Braden*, 588 F.3d at 594. First, Dr. Grevlos does not simply allege termination as the only adverse employment action, but rather alleges several instances of Augustana removing her from various positions and reducing her salary. *See* Docket 1 ¶¶ 39, 50. For example, the gap between Dr. Grevlos's initial filing of her Title IX complaint (April 6, 2021) and her removal from being the Department Chair, Director of Vocal Studies, and Director of the Augustana Summer Music Camp (along with an accompanying salary loss) is a mere three days. *See id.* ¶¶ 35-36, 39. Similarly, within a month of Augustana learning that the OCR referred Dr. Grevlos's complaint to the EEOC, Augustana removed Dr. Grevlos as conductor of the Angelus Choir and Director of Opera Theatre. *Id.* ¶ 50. These sequences of events are enough to plausibly allege retaliation with respect to these alleged adverse actions.

Second, Augustana's argument ignores that it learned of some of Dr. Grevlos's key protected activities just days before terminating her. *Cf. Littleton v. Pilot Traveler Centers, LLC*, 568 F.3d 641, 645 (8th Cir. 2009) (stating employer's lack of knowledge of protected activity to undermine a finding of causation). On February 24, 2023, Dr. Grevlos alleges that she requested a

notice of right to sue from the EEOC. *Id.* ¶ 66. On February 27, 2023, the EEOC notified Augustana of Dr. Grevlos's request. *Id.* ¶ 68. Four days later, Augustana issued a dismissal for cause, terminating Dr. Grevlos. *Id.* ¶ 70. This timing alone—with mere days passing between Augustana's knowledge of Dr. Grevlos's protected activity and the issuance of dismissal for cause—is sufficient to show a plausible causal connection between Dr. Grevlos's protected activity and termination.

Third, Dr. Grevlos alleges additional facts that indicate Augustana's alleged hostility towards her engaging in protected activity. For example, Dr. Grevlos alleges that in July 2021, she learned her Title IX complaint would not proceed and her concerns would be sent to Provost Irvine. *Id.* ¶ 42. Dr. Grevlos further alleges that she repeatedly had to request Augustana to issue a Title IX report, which Augustana released in September 2021. *Id.* ¶ 43. The fact that Dr. Grevlos had to repeatedly ask Augustana to issue a Title IX report raises a plausible inference, at least in context, that Augustana had a negative attitude towards Dr. Grevlos filing her Title IX complaint. Then, just two months later on November 12, 2021, Dr. Grevlos alleges that Provost Irvine and the Vice President of Human Resources, Deanna Versteeg, called Dr. Grevlos into a meeting. *Id.* ¶ 44. At this meeting, Dr. Grevlos alleges that Provost Irvine threatened to dismiss Dr. Grevlos if Dr. Grevlos "continued her 'pattern of discontent,' referring to her complaints regarding her treatment by Drs. Folliard and Svenningsen." *Id.* ¶ 45. When complaining of Dr. Grevlos's "pattern of discontent," Provost Irvine plausibly referred to Dr. Grevlos's Title IX

20

complaints. *Id.* Dr. Grevlos also alleges that someone, presumably a relevant decisionmaker at Augustana, told her that her complaints were "problematic." *Id.* Viewed in the light most favorable to Dr. Grevlos, Augustana's alleged explicit threat to dismiss Dr. Grevlos because of Dr. Grevlos's participation in protected activity shows Augustana's open hostility towards her activity and is highly probative in establishing the requisite causal link between her activity and the adverse employment actions.

In short, assuming the truth of these allegations, as the court must, Dr. Grevlos pleaded more than sufficient facts to plausibly allege that Augustana removed her from her positions, cut her pay, and ultimately terminated her because of her attempts to oppose Augustana's alleged discrimination. *See* Docket 1 ¶¶ 39, 50, 70. The court denies Augustana's motion to dismiss Dr. Grevlos's retaliation claim.

### b. Dr. Nesheim

Much of the analysis for Dr. Grevlos applies to Dr. Nesheim. Similar to Dr. Grevlos, Augustana argues that the gap in time between Dr. Nesheim's alleged protected activity and adverse employment actions (which Augustana identifies as suspension and termination) is insufficient to establish a plausible inference of causation. *See* Docket 13 at 13-14.

But Augustana ignores several important allegations. First, the gap is only three days between Dr. Nesheim participating as a witness for Dr. Grevlo's Title IX complaint (April 6, 2021) and Augustana removing him as the Director of Choral Activities and artistic Director of Vespers. *See* Docket 1 ¶ 35-37. This

time period alone is sufficient for Dr. Neisheim's claim to survive with respect to these alleged adverse employment actions. Second, on January 4, 2022,[5] Dr. Nesheim alleges that he filed an OCR complaint relating to his support of Dr. Grevlos and participation as a witness to Dr. Grevlos's Title IX complaint. *See id.* ¶ 47. That same month, OCR referred Dr. Nesheim's complaints to the EEOC and notified Augustana. *Id.* ¶ 49. On February 25, 2022, less than two months later, Augustana removed Dr. Nesheim as the conductor of Augustana's choir. *Id.* ¶ 50. This relatively short gap in time again sufficiently alleges that Dr. Nesheim suffered an adverse employment action because of his OCR complaint and subsequent referral to the EEOC.[6]

And third, Dr. Nesheim alleges that he requested a notice of right to sue from the EEOC on February 24, 2023, and that the EEOC notified Augustana

---

[5] The complaint lists January 4, 2021 as the date Dr. Nesheim filed his OCR complaint. Docket 1 ¶ 47. Dr. Nesheim states that he inadvertently listed the year as 2021 instead of 2022. *See* Docket 18 at 17 n.1. The court credits this explanation based on the timeline of events laid out in the complaint. *See generally* Docket 1 ¶¶ 46-50 (alleging events in chronological order). Dr. Nesheim also requests leave to amend the complaint should the court require further clarification. Docket 18 at 17 n.1. While this request is likely not a motion, Federal Rule of Procedure 15(a)(1)(B) instructs that the court "should freely give leave when justice so requires." Unlike some rules, Rule 15's text does not require a motion to grant leave, and thus the court grants Dr. Nesheim leave to amend his complaint regarding this specific date. *Compare* Fed. R. Civ. P. 15(a)(1)(B), *with* Fed. R. Civ. P. 37(c)(1) (requiring a party wishing to obtain attorney's fees and costs for failure to timely disclose an expert report to file a motion); *see also Newbauer v. Carnival Corp.*, 26 F.4th 931, 936 (11th Cir. 2022).

[6] Like Dr. Grevlos, Dr. Neishem alleges that in June 2022, he had to re-file charges to the EEOC due to a mistake OCR made in referring the case to the EEOC. Docket 1 ¶ 51.

of his request on February 27, 2023. *Id.* ¶¶ 66, 68. That very same day, on February 27, 2023, Augustana issued a dismissal for cause terminating Dr. Nesheim. *Id.* ¶ 69. Needless to say, Augustana's issuance of this termination on the exact same day Dr. Nesheim engaged in protected activity is sufficient to show a plausible, causal nexus between the two. Taken as a whole, Dr. Nesheim plausibly established that Augustana removed him from being the Director of Choral Activities, Artistic Director of Vespers, and Conductor of the Augustana Choir, suspended him, and ultimately terminated him because of his protected activities. *See id.* ¶¶ 37, 62, 69.  The court denies Augustana's motion to dismiss Dr. Nesheim's retaliation claims.

### 3.  Sex Discrimination

The court next turns to Augustana's motion to dismiss Dr. Grevlos's Title VII sex discrimination claim. Title VII prohibits employers from discrimination based on sex with respect to compensation, terms, conditions, or privileges of employment. *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009); 42 U.S.C. § 2000e-2(a)(1). To succeed on a sex discrimination claim under Title VII, a plaintiff may rely on direct or indirect evidence. *See id.* Dr. Grevlos only argues that she plausibly alleges sex discrimination through indirect evidence, and thus the court confines its analysis to such. *See* Docket 18 at 10.

Under an indirect evidence framework, a plaintiff must make a prima facie claim of sex discrimination by proving "(1) she belongs to a protected group; (2) she was qualified for her former job; (3) she suffered an adverse

employment action; and (4) the circumstances give rise to an inference of discrimination." *Warmington v. Bd. of Regents of Univ. of Minn*, 998 F.3d 789, 797 (8th Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Augustana argues only that the circumstances do not give rise to an inference of discrimination because she failed to allege bias relevant to each alleged adverse employment action. *See* Docket 13 at 11-12.[7]

For a sex discrimination claim to survive, a plaintiff must allege that she suffered an adverse employment action and that the circumstances give rise to an inference of discrimination in that specific adverse action. *See Smothers v. Rowley Masonic Assisted Living Comm., LLC*, 63 F.4th 721, 728-30 (8th Cir. 2023) (separately evaluating plaintiff's claims by each alleged adverse action); *Warmington*, 998 F.3d at 798 (requiring female plaintiff to plausibly allege that circumstances gave rise to the inference of discrimination on the basis of sex "*as the reason for her termination*" (emphasis added)); *see also Tatum v. City of Berkeley*, 408 F.3d 543, 551 (8th Cir. 2005) (separately evaluating two employees' racial discrimination claims based on adverse employment actions of termination and adverse employment actions of forced drug testing). In *Warmington*, a female coach alleged her employer terminated her because of her sex. *Warmington*, 998 F.3d at 796. The female coach plausibly pleaded that her employer treated her differently than other coaches and athletes, that her

---

[7] Augustana also argues it had obvious alternative explanations for terminating Dr. Grevlos, relying on the contents of the FGC findings, but for the reasons stated above, the court declines to consider this argument. *See* Docket 13 at 9-11.

24

employer treated her teams differently than "other teams," and that her employer treated employees differently based on sex. *See id.* at 797-98. Even with these factual allegations, the Eighth Circuit found that she failed to "plausibly give rise to an inference of discrimination as the reason for [the female coach's] termination." *Id.* at 798. The court reasoned that the employer's differential treatment of men and women was insufficiently connected to the employer's ultimate reason of terminating the female coach. *See id.*

Based on *Warmington*, the court makes two observations. First, a plaintiff may not rely solely on allegations that the employer generally treated male and female employees differently. *See id.* at 798. Rather, a plaintiff must show something else to tie such differential treatment to the specific alleged adverse employment action. *See id.* Second, while *Warmington's* discussion is a helpful guide, nowhere in *Warmington* did the court discuss any alleged statements made by decisionmakers indicating discriminatory bias, nor did it discuss the specific timing of the alleged events as it related to the plaintiff's eventual termination. *See generally id.* at 795-80.

Augustana argues that Dr. Grevlos's sex discrimination claim fails for the same reason the female coach's claim in *Warmington* failed because Dr. Grevlos failed to allege relevant evidence of sex discrimination for each specific adverse action. *See* Docket 13 at 11-12. But at least some of the alleged adverse employment actions Dr. Grevlos suffered are distinguishable from the female coach's claims in *Warmington*. The court begins with Dr. Grevlos's allegations that Augustana removed her as Department Chair, Director of Vocal Studies,

Director of the Augustana Summer Music Camp, and lowered her salary. Dr. Grevlos pleaded that Dr. Svenningsen and Dr. Folliard, both males, excluded Dr. Grevlos from scheduled choral/vocal area meetings so the two men could engage in "real talk." Docket 1 ¶ 31. Dr. Folliard further explained to Dr. Nesheim that including Dr. Grevlos could make the meetings become "emotional." *Id.* Taking these two comments together, Dr. Grevlos plausibly alleges that Dr. Svenningsen and Dr. Folliard harbored bias against women. *See id.* ¶ 31. While neither of these reasons explicitly mention Dr. Grevlos's sex, it is plausible to infer sex discrimination because, taken together, they are plausibly based on gendered stereotypes that women are too emotional and incapable of rationally making decisions. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (plurality opinion of four Justices opining that discrimination based on a sex stereotype is a form of sex discrimination); *id.* at 258-61 (White, J. concurring); *id.* at 272-73 (O'Connor, J., concurring) (agreeing with plurality's sex stereotyping analysis and characterizing the "failure to conform to [gender] stereotypes" as a discriminatory criterion); *see also Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991) ("His comments could suggest that [he] made his decision [to promote] on the basis of stereotypical images of men and women, specifically that women do not make good leaders because they are too 'emotional.' "); *Hussain v. Fed. Express Corp.*, 657 Fed. Appx. 591, 594 (7th Cir. 2016) (concluding employer's comments of female employee being overly aggressive, being too emotional, and showing too much facial expression was reasonably sex discrimination based on sex-stereotyping).

Importantly—and unlike the female coach in *Warmington*—Dr. Grevlos alleged that Augustana removed her from her positions and reduced her salary shortly after these comments and after excluding her from the all-male meetings. *See* Docket 1 ¶¶ 31, 35, 39-41. On April 9, 2021, within months of Dr. Folliard and Dr. Svenningsen excluding Dr. Grevlos based on impermissible sex stereotypes, [8] Dr. Grevlos alleges that Augustana removed her from her positions and reduced her salary. *Id.* ¶¶ 35, 39-40. At this pleading stage, this timing is sufficient to support an inference that Augustana removed Dr. Grevlos as Department Chair, Director of Vocal Studies, Director of the Augustana Summer Music Camp, and lowered her salary because of her sex.

But unlike Dr. Grevlos's removal from these positions and her salary reduction, Dr. Grevlos's sex discrimination claims with respect to her removal as the Conductor of the Angelus Choir and Director Opera Theatre, as well as her termination, cannot survive. Dr. Grevlos alleged that Augustana removed her as the Conductor of the Angelus Choir and Director of the Opera Theatre on February 25, 2022. *Id.* ¶ 50. This adverse employment action took place nearly a year after Dr. Folliard and Dr. Svenningsen made the biased remarks and excluded her from the all-male meetings. *See id.* ¶¶ 30-32, 50. Similarly,

---

[8] Dr. Grevlos's complaint does not explicitly allege when Dr. Svenningsen and Dr. Folliard made such comments and excluded Dr. Grevlos from these meetings. *See id.* But the court reads the complaint in whole and finds that these events plausibly took place between September 2020 and March 2021 because the complaint alleges these meetings took place in between other events taking place in September 2020 and March 2021, *see id.* ¶¶ 30-32, and the specific section of this complaint organizes the allegations in chronological order, *see generally id.* ¶¶ 8-76.

Dr. Grevlos's alleged termination occurred on March 3, 2023, nearly two years after such biased comments and exclusions from the meetings. *Id.* ¶ 30-32, 70. These time gaps are too great to "plausibly give rise to an inference of discrimination as the reason for [Grevlos's] [removal from these two positions and her termination]." *Warmington*, 998 F.3d at 798. Dr. Grevlos implicitly acknowledges this gap by arguing that Augustana's alleged biased actions taken against her because of her sex are "temporally and causally related to *several* adverse employment actions." Docket 18 at 11 (emphasis added). Dr. Grevlos does not allege any other facts suggesting Augustana removed her from being the Angelus Choir Conductor or Opera Theatre Director because of her sex, nor that Augustana terminated her because of her sex. Thus, her sex discrimination claims with respect to these adverse employment actions fail.

In summary, Dr. Grevlos's sex discrimination claims with respect to her alleged removal as Department Chair, Director of Vocal Studies, Director of the Augustana Summer Music Camp, and reduced salary survive. But Dr. Grevlos's sex discrimination claims with respect to her alleged removal as the Conductor of the Angelus Choir, Director of the Opera Theatre, and termination fail.

### 4. Age Discrimination

The Age Discrimination in Employment Act (ADEA) prohibits employers from discriminating against employees based on age. 29 U.S.C. § 623(a)(1). To establish an ADEA claim, a plaintiff may rely on direct or circumstantial evidence. *See Aulick v. Skybridge Americas, Inc.*, 860 F.3d 613, 620 (8th Cir.

2017). Dr. Grevlos and Dr. Nesheim only rely on circumstantial evidence, and thus the court confines its analysis accordingly. *See* Docket 18 at 5-7.

To prove an indirect age discrimination claim, a plaintiff must first establish a prima facie claim, which requires that the employee (1) was at least forty years old, (2) was meeting her employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Smothers*, 63 F.4th at 728. At all times, the burden of persuasion rests with the plaintiff to prove that "age was the 'but-for cause", of the employer's adverse employment action. *See Rahlf v. Mo-Tech Corp., Inc.*, 642 F.3d 633, 637 (8th Cir. 2011).

Augustana argues only that the court should dismiss Dr. Grevlos's and Dr. Nesheim's age discrimination claims based on the FGC findings. *See* Docket 13 at 4-9; Docket 19 at 6-8. But because the court does not consider these findings at this stage, the court rejects Augustana's argument. The court declines to make additional arguments for Augustana and thus finds it appropriate to dismiss only if plaintiffs' claims are so obviously non-plausible.

Starting with the first three prima facie requirements for Dr. Grevlos's and Dr. Nesheim's age discrimination claims, both plaintiffs allege they were over forty years old, had received numerous awards and recognitions, found to be "highly competent and excellent in [their] work, scholarship, and services as a music faculty member[s,]" and that they suffered various adverse employment actions (as discussed above). *See* Docket 1 ¶¶ 10, 12, 16-17, 37-

29

39, 40, 41, 62, 69. Thus, the court finds Dr. Nesheim and Dr. Grevlos have met the first three requirements of their prima facie age discrimination claims.

The court turns to the fourth requirement and separately evaluates plaintiffs' claims.

### a.  Dr. Grevlos

Dr. Grevlos alleges that Augustana used her annual salary, based on twenty-nine years of teaching, as a basis to change her teaching load and remove students from her courses, while younger, male colleagues' teaching loads stayed the same. *Id.* ¶ 40. "[E]mployment decisions motivated by characteristics other than age (such as salary and pension benefits), even when such characteristics correlate with age, do not constitute age discrimination." *Brown v. McDonnell Douglas Corp.*, 113 F.3d 139, 142 (8th Cir. 1997). Nevertheless, Dr. Grevlos argues that the Eighth Circuit's more recent decision in *Tramp v. Assoc. Underwriters, Inc.*, 768 F.3d 793 (8th Cir. 2014) allows an age-based discrimination claim to be based on an employer's consideration of salary. *See* Docket 18 at 6.

In *Tramp*, the Eighth Circuit considered whether an employer's purported decision to fire an employee based on an expected reduction in health care premiums was sufficient to survive summary judgment on an ADEA claim. *See Tramp*, 768 F.3d at 801-03. The *Tramp* court first began by explaining the Supreme Court's decision in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993), which dealt with a company's decision to terminate an employee to avoid paying his benefits because his pension was set to vest soon

30

based on his years of service with the company. *See Hazen*, 507 U.S. at 606-07. The Supreme Court made clear that there is no ADEA discrimination "[w]hen the employer's decision *is* wholly motivated by factors other than age . . . even if the motivating factor is correlated with age[.]" *Id.* at 611 (emphasis in original). The Court explained that because a pension plan is not necessarily intertwined with age (for example, a younger employee may have more service years with a company than an older but newer employee), they are analytically distinct such that it was "incorrect to say that a decision based on years of service is necessarily 'age based.' " *Id.* As such, the Supreme Court held that there can be no ADEA liability "when the factor motivating the employer is some feature other than the employee's age." *Id.* at 609.

Following *Hazen*, the Eighth Circuit in *Tramp* held that summary judgment was inappropriate because "it [was] possible that a reasonable jury could conclude from the evidence that [the employer] believed [age and health care costs] were not analytically distinct." *Tramp*, 768 F.3d at 802. The court explained that certain considerations, such as health care costs, "*could* be a proxy for age" and thus "if the employer supposes a correlation between the two factors and acts accordingly, it engages in age discrimination." *Id.* (emphasis in original).

Here, Dr. Grevlos alleges that Augustana used salary considerations as a basis to change her teaching load and remove students from her courses. Docket 1 ¶¶ 40, 118. By alleging Augustana reduced her teaching load because of her salary, Dr. Grevlos has failed to plausibly allege age discrimination here,

because although salary is often associated with age, it is nonetheless "analytically distinct" such that a decision to reduce salary payouts does not alone necessarily encompass age discrimination. *See Tramp*, 768 F.3d at 802; *Hazen*, 507 U.S. at 611. Dr. Grevlos does not allege that Augustana used salary as a mere pretext to hide age discrimination, nor does Dr. Grevlos allege any facts to suggest that Augustana necessarily viewed salary as being intertwined with age. Thus, the court finds Dr. Grevlos's allegations regarding salary considerations insufficient to plausibly allege age discrimination.

But this finding is not necessarily dispositive, because Dr. Grevlos also alleges that Augustana eliminated the Summer Music Camp led by Dr. Grevlos and established separate summer camps, which were led by younger male faculty. Docket 1 ¶ 41. While these allegations may not be enough to raise a plausible inference of age discrimination, because Augustana did not raise this argument, the court is hesitant to dismiss on this basis. Thus, the court finds Dr. Grevlos has plausibly alleged age discrimination with respect to Augustana's decision to remove her from being the Director of the Augustana Summer Music Camp.

Dr. Grevlos's other age discrimination claims, however, fail to adequately allege plausible circumstances giving rise to age discrimination. Specifically, Dr. Grevlos failed to allege facts showing that Augustana placed younger individuals in her positions after she was removed. Dr. Grevlos failed to allege who replaced her position as Department Chair. *See id.* ¶¶ 39. With respect to her role as Director of Vocal Studies, Dr. Grevlos only alleges that Augustana

replaced her with Dr. Svenningsen, but does not allege Dr. Svenningsen's age. *See id.* ¶ 41. Dr. Grevlos's age discrimination claim with respect to her role as Conductor of the Angelus Choir fares even worse, because she alleges that Augustana replaced her with Dr. Nesheim, an individual who is *older* than she is. *See id.* ¶¶ 50, 114. Regarding Dr. Grevlos's age discrimination claim with her removal as Director of Opera Theatre, Dr. Grevlos fails to allege who replaced her in this position. *See generally id.* ¶¶ 50, 118. And finally, with respect to her termination claim, she fails to allege who replaced her. *See generally id.* ¶¶ 70, 118. Because of these deficiencies, Dr. Grevlos has not adequately alleged facts sufficient to raise a plausible inference that Augustana discriminated against her because of her age. *See Iqbal*, 556 U.S. 662; *see also Blomker*, 831 F.3d at 1056.

While Dr. Grevlos is not required to make a prima facie case at this stage, "the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim." *Blomker*, 831 F.3d at 1056. Here, the court finds Dr. Grevlos failed to plausibly allege age discrimination with respect to these adverse actions, and thus dismisses these claims.

In sum, Dr. Grevlos's age discrimination claim with respect to Augustana's decision to remove her from role as Director of the Augustana Summer Music Camp survives. But none of Dr. Grevlos's other age discrimination claims survive because Dr. Grevlos has failed to sufficiently allege they are plausible.

### b.  Dr. Nesheim

The court first considers Dr. Nesheim's allegation that Augustana removed him from being the Artistic Director of Vespers and Conductor of the Augustana Choir. *See* Docket 1 ¶ 37, 118. Dr. Nesheim alleges that with respect to these positions, Augustana replaced him with "younger faculty." *Id.* ¶ 118. Relatedly, Dr. Nesheim alleges that Dr. Folliard described that anonymous leaders commented that Vespers was "tiring" and that Dr. Svenningsen called it "old-fashioned." *Id.* ¶ 38. The court finds these facts sufficiently raise a plausible inference of age discrimination because these comments, viewed in the light most favorable to Dr. Nesheim, show that Augustana harbored bias against Dr. Nesheim because of his perceived inability to show sufficient energy and keep up with modern times. If true, these beliefs are rooted in stereotypes about older people and thus constitute age discrimination. Dr. Nesheim's age discrimination claims with respect to his removal from being the Artistic Director of Vespers and Conductor of the Augustana Choir survive.

But Dr. Nesheim's age discrimination claims with respect to Augustana's decision to remove Dr. Nesheim from being the Director of Choral Activities, to suspend him, and to terminate him are implausible on the face of his complaint. Dr. Nesheim does not allege who replaced him as the Director of Choral Activities, nor does he allege who replaced him once Augustana terminated his employment. *See generally id.* ¶¶ 37, 69, 118. Dr. Nesheim also fails to allege any other facts indicating Augustana's bias with respect to any of

these alleged adverse actions. These deficiencies show these claims are implausible, and thus the court dismisses Dr. Nesheim's age discrimination claims with respect to these specific alleged adverse actions.

In short, the court dismisses Dr. Nesheim's age discrimination claims regarding Augustana's decision to remove him as Director of Choral Activities, to suspend him, and to terminate him, but does not dismiss his age discrimination claims regarding Augustana's decision to remove him as the Director of Vespers and the Conductor of the Augustana Choir.

### 5. Breach of Contract

The parties agree that Augustana entered into an enforceable contract with Dr. Grevlos and Dr. Nesheim. *See* Docket 1 ¶ 125; Docket 13 at 17-19. Augustana argues, however, that the parties agreed to arbitrate the plaintiffs' breach of contract claims and that such agreement bars the plaintiffs from seeking judicial relief. *See* Docket 13 at 17-23.

Under the Federal Arbitration Act (FAA), "agreements to arbitrate [are] 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' " *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2)).[9]

---

[9] Augustana suggests that the FAA does not apply to this employment. *See* Docket 13 at 18 n.5. But the FAA applies to any "written provision in any maritime transaction *or a contract evidencing a transaction involving commerce . . . .*" 9 U.S.C. § 2 (emphasis added). The phrase "evidencing a transaction involving commerce," must be interpreted "broadly" such that it extends as far as Congress's commerce power. *See Allied-Bruce Terminix Co. Inc., Inc. v. Dobson*, 513 U.S. 265, 277 (1995); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 112 (2001). Congress's commerce power is so "broad and

Similarly, the South Dakota Legislature[10] has adopted the Uniform Arbitration Act, which provides:

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

SDCL § 21-25A-1. South Dakota explicitly provides that this Act applies to arbitration agreements "between employers and employees[.]" *Id.*

Augustana focuses its arguments on whether the parties agreed to arbitrate the plaintiffs' breach of contract claims. *See* Docket 13 at 17-23. But even if the parties agreed to arbitrate such claims, that does not resolve the

---

sweeping[,]" *Katzenbach v. McClung*, 379 U.S. 294, 305 (1964), that as long as, "in the aggregate," an activity "would represent 'a general practice . . . subject to federal control[,]' " Congress may regulate such activity, *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003) (ellipses in original)(quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)). Generally, employment disputes within a university setting are sufficiently connected to interstate commerce because not only do universities teach out-of-state students, but frequently recruit out-of-state faculty members. *See Brennan v. King*, 139 F.3d 258, 264 (1st Cir. 1998) (applying FAA to employment dispute between faculty and University); *Abdullah v. Duke Univ. Health Sys., Inc.*, 2009 WL 1971622, *3 (E.D.N.C. July 8, 2009) (concluding that FAA governs employment dispute between hospital employee and hospital because hospital treats patients from all over the world and receives payments from individuals and entities outside the state). Here, the activity at issue is employment within a university context. *See* Docket 1 ¶¶ 4, 125-136. Specifically, the plaintiffs are professors with terminal degrees who have travelled across state lines to teach at Augustana. *See id.* ¶¶ 8, 13. Additionally, Augustana's Handbook itself states that it is authorized to enroll non-immigrant students from other countries. *See* Docket 14-3 at 5. Thus, the court finds the FAA applies.

[10] The court need not determine whether the FAA completely preempts South Dakota's arbitration agreement here.

inquiry. Rather, the court must be careful to distinguish an agreement to arbitrate a matter from an agreement to have such arbitration bind the parties. *See Dow Corning Corp. v. Safety Nat'l Cas. Corp.*, 335 F.3d 742, 745 (8th Cir. 2003) (discussing difference between binding and non-binding arbitration). In other words, a party's agreement to arbitrate a matter does not necessarily foreclose its ability to bring a lawsuit because parties "may instead agree to non-binding arbitration, in which case the arbitrators' decision is likely to be a precursor to further litigation on the merits of the dispute." *Id.*

Here, the court need not determine whether the parties entered into an arbitration agreement[11] because even if they did, their agreement was non-binding such that the court may consider plaintiffs' breach of contract claims. To interpret an arbitration agreement,[12] the court applies state contract law principles.[13] *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944

---

[11] It is doubtful that, at least under South Dakota law, the Handbook constituted a valid arbitration agreement. Under South Dakota law, parties in an arbitration proceeding have "the right to be represented by an attorney" and "[a] waiver thereof prior to the proceeding or hearing is ineffective." SDCL § 21-25A-16. Here, although the Handbook allows parties to have counsel *present* at the FGC hearing, the Handbook explicitly forbids outside counsel from participating in the hearing. *See* Docket 14-3 at 45. The mere allowance of counsel to be present is not equivalent to the right to be *represented* by counsel. Thus, the FGC hearing does not appear to constitute a valid arbitration proceeding, at least under South Dakota law. *See* SDCL § 21-25A-16.

[12] The court reiterates that its analysis assumes the existence of an arbitration agreement, but importantly does not decide whether the Handbook is indeed an arbitration agreement.

[13] The parties do not explicitly which state's contract law principles should apply. *See generally* Docket 13 at 17-13; Docket 18 at 18-24. Because the relevant events took place in South Dakota, all parties reside in South Dakota,

(1995); *see also Giddings v. Media Lodge, Inc.*, 320 F.Supp.3d 1064, 1077 (D.S.D. 2018) (applying state law to determine whether a valid arbitration agreement existed). "In order to ascertain the terms and conditions of a contract, [courts] must examine the contract as a whole and give words their 'plain and ordinary meaning.' " *Coffey v. Coffey*, 888 N.W.2d 805, 809 (S.D. 2016) (quoting *Gloe v. Union Ins. Co.*, 694 N.W.2d 252, 260 (S.D. 2005)). Similarly, the court must not "interpret language 'in a manner that renders a portion of [the contract] meaningless.' " *Tri-City Assocs., L.P. v. Belmont, Inc.*, 845 N.W.2d 911, 915 (S.D. 2014) (quoting *Estate of Fisher v. Fisher*, 645 N.W.2d 841, 846 (S.D. 2002)).

In *McAdams v. Marquette Univ.*, 914 N.W.2d 708, 718-20 (Wis. 2018), the Wisconsin Supreme Court held that a faculty disciplinary procedure set forth in a contractually binding faculty handbook—one that is substantially similar to the handbook at issue in this instant case—did not foreclose a tenured professor's ability to seek relief in court. *See id.* at 712. There, the contract forbade suspending a faculty member without cause. *Id.* at 713. After the professor made a controversial blog post, the University initiated its process for suspending or dismissing a tenured faculty member. *See id.* at 713-14.

Crucially, the contract in *McAdams* explicitly contemplated litigation before a judicial court. *See id.* at 719. Specifically, one of the provisions stated:

> To the extent that none of the foregoing procedures produces a resolution of the issues arising out of a timely objection to a faculty

---

and because the contract was presumably entered into in South Dakota, the court assumes South Dakota contract law applies. *See* Docket 1 ¶¶ 2-4, 7.

> member's non-renewal, suspension, or termination, at or prior to
> the time specified in the preceding paragraph, *the University shall*,
> for a period of six months thereafter, *or until the final determination*
> *of any judicial action which may be commenced within such period to*
> *test the validity of the non-renewal, suspension, or termination*, hold
> itself ready to reinstate the faculty member, with unimpaired rank,
> tenure, compensation, and benefits, *to the extent that the faculty*
> *member's entitlement thereto may be judicially adjudged or decreed*,
> or conceded by the University in such interval.

*Id.* at 719-20 (some emphasis added and some in original). The Wisconsin

Supreme Court reasoned that this provision "unambiguously recognizes that

the University's suspension and dismissal decisions are subject to litigation in

our courts." *Id.* at 720. Because the contract's description of the courts' role did

not "resemble the method by which [the courts] review arbitration awards[,]"

*McAdams* held that the agreement was not an arbitration agreement, nor did it

strip away the professor's right to litigate his claims in court. *Id.* at 720-21.

Here, Augustana argues that the plaintiffs "cannot come to this Court

and seek redress under the Handbook when they have already submitted such

grievances to ADR [Alternative Dispute Resolution] and are bound by the

parties' written and enforceable ADR clause." *See* Docket 19 at 12-13. But just

as in *McAdams*, the Handbook says otherwise because it contemplates the

possibility of litigation in judicial courts. *See McAdams*, N.W.2d at 719; Docket

14 at 42. Specifically, the Handbook provides:

> Should any grievance[14] initiate court or agency action, Augustana
> University reserves the right to continue or discontinue internal

---

[14] The Handbook defines "grievance" as an "allegation of a misapplication or
misinterpretation of any clause in the employment policies portion of the
handbook." Docket 14-3 at 42. The Handbook also states that, "[c]omplaints
related to equity grievances (Title IX, sexual harassment, discrimination or

> procedures to complete record as warranted. Such a decision shall
> be of the President, advised by the Legal Council.

Docket 14-3 at 42. This provision explicitly states that a party may "initiate court . . . action." *Id.* Thus, the Handbook is not silent on whether the FGC procedure replaces a court; it explicitly allows for court action. *See id.* This alone shows that the plaintiffs may litigate their breach of contract claims in court. *See McAdams*, N.W.2d at 719-20.

Furthermore, the Handbook's provision contemplating litigation is instructive because not only does the Handbook contemplate litigation in court, it also strongly suggests that a professor may sue Augustana in court even before the end of the disciplinary process. By stating that Augustana "reserves the right to continue or discontinue internal procedures" once a grievance is initiated in court, the Handbook implicitly concedes that a professor need not complete the internal grievance procedure before accessing the court. *See* Docket 14-3 at 42. This feature also strongly suggests that the Handbook is not an arbitration agreement to begin with. *See Harrison v. Nissan Motor Corp.*, 111 F.3d 343 (3d Cir. 1997) (concluding that alternative dispute resolution process at issue was not arbitration within the meaning of the FAA because the process allowed parties to "seek recourse to the courts" before the process was

---

other bias related conduct) are to be resolved as described in the Augustana University Equal Opportunity Policies and Procedures document." *Id.* These procedures "[are] intended to provide the faculty with an efficient, concise, and fair process to resolve grievances that are grounded in a misapplication or misinterpretation of employment policies." *Id.*

resolved); *see also Wosley, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1208-09
(9th Cir. 1998) (adopting the reasoning in *Harrison*).

None of the cases cited by Augustana in support of its argument that the
Handbook is a binding arbitration agreement dealt with contracts that
expressly contemplated litigation. Rather, many of them did the opposite. *See,
e.g.*, *Schwalm v. TCF Nat'l Bank*, 226 F.Supp.3d 937, 944 (D.S.D. 2016)
(dealing with contract that expressly provided that employee and employer "will
not have a right to bring a lawsuit against one another . . . regarding Covered
Claims."); *Flores v. Nat'l Football League*, 658 F.Supp.3d 198, 213 (S.D.N.Y.
2023) ("[T]he parties agreed to submit any disputes to [a third-party] *and that
[the third-party's] decision would be binding.*" (emphasis added)); *McDonnell
Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988)
("[T]he language *clearly manifests an intention* by the parties to submit certain
disputes to a specified third party for *binding resolution.*"(emphasis added));
*Lambert v. Signature Healthcare, LLC*, 2022 WL 2571959, at *1 (11th Cir. 2022)
(dealing with an arbitration agreement that provided all employment related
claims "shall be deemed waived unless submitted to *final and binding
arbitration*" (emphasis added)). One case Augustana cites actually supports the
distinction between deciding whether there is an arbitration agreement versus
whether any such agreement binds the parties. *See AMF Inc. v. Brunswick
Corp.*, 621 F.Supp. 456, 460 (E.D.N.Y. 1985) (recognizing that the parties
agreed to arbitrate even though the arbitrator's decision was non-binding).
Thus, the court rejects Augustana's argument that the court may not hear the

41

plaintiffs' breach of contract claims because the Handbook explicitly contemplates litigation.

Augustana further argues that even if the court can consider the breach of contract claims, the court must limit its review of the FGC findings and defer to such findings. *See* Docket 13 at 23-25. In support, Augustana cites two cases, *Peterson v. N.D. Univ. Sys.*, 678 N.W.2d 163, 169 (N.D. 2004) and *Beville v. Univ. of S.D./S.D. Bd. of Regents*, 420 N.W.2d 9, 14 (S.D. 1988). Neither of these decisions support Augustana's position because unlike *Peterson* and *Beville*, Augustana is a private institution. *See Peterson*, 678 N.W.2d at 169; *Beville*, 420 N.W.2d at 10-11; *see also* Docket 14-3 at 5-6 (recognizing Augustana University is a Christian university owned by a non-profit corporation called "Augustana University Association").

In both *Peterson* and *Beville*, the court reviewed state decisions that were either akin to administrative decisions or actual administrative decisions. *See Peterson*, 678 N.W.2d at 169; *Beville*, 420 N.W.2d at 11-12. But here, Augustana is a private university and thus "the theory of deference to administrative action [that] flows from prudential concepts of separation of powers, as well as statutory proscriptions on the scope of judicial review[,]" "obviously" do not apply. *McConnell v. Howard Univ.*, 818 F.2d 58, 69 (D.C. Cir. 1987). Indeed, "[t]he notion of treating a private university as if it were a state or federal administrative agency is simply unsupported where a contract claim is involved." *Id.; see also McAdams*, 914 N.W.2d at 727-28 (declining to defer to private university's decision and citing *McConnell* in support). Thus, the court

42

rejects Augustana's argument that the court must defer to Augustana's decision to terminate the plaintiffs.

Augustana argues that plaintiffs' breach of contract claims must fail based on the FGC's findings, *see* Docket 13 at 24, but the court does not consider the FGC's findings at this stage in the litigation. Instead, the court is limited to reviewing plaintiffs' well-pleaded allegations in their complaint. Here, plaintiffs quote specific provisions of the Handbook that outline the proper procedures Augustana must generally take before dismissing a tenured faculty member. *See* Docket 1 ¶¶ 129-33 (quoting Docket 14-3 at 91, 101-02). Additionally, plaintiffs pleaded that Augustana failed to comply with these provisions because it failed to give them reasonable time to remedy any issues, failed to provide them a statement of reasons for termination based on evidence, failed to provide them a statement of charges, and failed to demonstrate that plaintiffs' terminations were for cause. *See id.* ¶¶ 134-35. These allegations are sufficient to plausibly allege breach of contract. The court denies Augustana's motion to dismiss plaintiffs' breach of contract claims.

### B. More Definitive Statement

As an alternative to complete dismissal of plaintiffs' discrimination claims, Augustana asks for a more definite statement under Federal Rule of Civil Procedure 12(e). Rule 12(e) provides in part:

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

Fed. R. Civ. P. 12(e). Such a motion must "point out the defects complained of and the details desired." *Id.* A motion under Rule 12(e) is "generally disfavored in light of liberal discovery available under the federal rules and [] granted only when a party is unable to determine the issues requiring a response." *Broin & Assocs. v. Genencor Int'l, Inc.*, 232 F.R.D. 335, 340 (D.S.D. 2005) (quoting *Shaffer v. Eden*, 209 F.R.D. 460, 464 (D. Kan. 2002)). "Rule 12(e) motions are designed to strike at unintelligibility rather than want of detail." *Caruth v. Wexford Health Sources, Inc.*, 2018 WL 3630014, *3 (N.D. Ill. July 31, 2018) (quotation omitted). "A Rule 12(e) motion must be balanced with the requirement in Rule 8(a) that the pleading be 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Broin*, 232 F.R.D. at 341 (quoting Fed. R. Civ. P. 8(a)).

Here, Augustana argues that the court should require plaintiffs to provide specific dates of alleged adverse employment actions because Augustana believes them to be time-barred. *See* Docket 13 at 16-17. But plaintiffs are not required to provide information relevant to an affirmative defense, such as a statute of limitations defense, and thus courts routinely deny a defendant's motion for definitive statement to flesh out a potential statute of limitations defense. *See MacKenzie v. Pfizer, Inc.*, 2021 WL 7451166, *3 (D. Mass. Jan. 11, 2021); *Smith v. Tyler*, 529 F.Supp.3d 708, 719 (W.D. Ky. 2021) (reasoning that defendant can raise statute of limitation defense and then plaintiffs can respond with specific dates to establish whether their claims are timely); *Neveu v. City of Fresno*, 392 F. Supp. 2d 1159, 1169 (E.D. Cal.

2005) (noting "[t]here is no requirement . . . that affirmative defenses, including statutes of limitation, appear on the face of the complaint" and noting Rule 12(e) statements should be denied unless the claims are so vague that its impossible to determine the nature of the claims being asserted). The court acknowledges that some courts have granted motions for more definitive statements so that defendants may raise a dispositive defense, such as a statute of limitations defense. *See, e.g.*, *Mut. Indus., Inc. v. Am. Int'l. Indus.*, 2011 WL 4836195, *4 (E.D. Pa. Oct. 11, 2011) (granting motion because the inclusion of such dates would "significantly advance the litigation").

But here, the specific dates that Augustana requests are as easily accessible—if not more so—to Augustana than they are to the plaintiffs, because the dates sought are ones involving alleged adverse actions that Augustana took against the plaintiffs. *See* Docket 13 at 17. This factor cuts against granting Augustana's Rule 12(e) motion. *See Coleman v. H.C. Price Co.*, 2012 WL 1118775, at *6 (E.D. La. Apr. 3, 2012) (recognizing that Rule 12(e) motion is "disfavored when 'the particular information defendant is seeking is within defendant's own knowledge[.]' " (quoting *Concepcion v. Bomar Holdings, Inc.*, 1990 WL 13257, at *2 (S.D.N.Y. Feb. 2, 1990)). Furthermore, nothing about the complaint's allegations makes Augustana "unable to determine the issues requiring a response." *Broin*, 232 F.R.D. at 340. The complaints' allegations are also not so "vague or ambiguous" because Augustana is on notice of specific alleged adverse employment actions it took against plaintiffs.

*See* Fed. R. Civ. P. 12(e). Thus, the court denies Augustana's motion for a more definite statement.

### C. Damages

Finally, Augustana argues the court should strike or dismiss certain types of damages plaintiffs seek. *See* Docket 13 at 25-26. Specifically, Augustana argues the court should strike or dismiss plaintiffs' prayer for emotional and humiliation damages for their breach of contract claims and ADEA age discrimination claims. *See id.*

Under Federal Rule of Civil Procedure 12(f), courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Striking a pleading "is an extreme and disfavored measure." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (BJC II). Motions to strike are reviewed for abuse of discretion. *Id.* In contrast, motions to dismiss under Rule 12(b)(6) "serve[] to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). Rule 12(b)(6) motions are reviewed de novo. *Missouri Broad. Ass'n. v. Lacy*, 846 F.3d 295, 300 (8th Cir. 2017).

Courts have struck damages using both Rules 12(f) and 12(b)(6), and appear to disagree over the proper rule under which to construe such a request. *Compare JS IP, LLC v. LIV Ventures, Inc.*, 2012 WL 2871794, *9 (D. Neb. July 12, 2012) (noting a request to dismiss

46

plaintiff's request for attorney's fees, profits, and punitive damages is not proper under Rule 12(b)(6)); *Spinks v. City of St. Louis Water Div.*, 176 F.R.D. 572, 574 (E.D. Mo. 1997) ("[A] prayer for relief not available under the applicable law, or which asserts a damage claim in excess of the maximum recovery permitted by law, is properly subject to a motion to strike."), *with Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974-75 (9th Cir. 2010) (holding that Rule 12(f) "does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law" and that such a request is better made under Rule 12(b)(6) or motion for summary judgment); *Johnson v. Dollar Gen.*, 778 F.Supp.2d 934, 952 (N.D. Iowa 2011) (granting Rule 12(b)(6) motion on claim for punitive damages). Although these rules are different and have different standards of review, the court need not decide whether to characterize Augustana's motion as one under Rule 12(f) or 12(b)(6) because the results would be the same under either.

Starting with plaintiffs' claims for emotional damages in their breach of contract claims, the general rule is that " 'extra-contractual damages, including those for emotional distress, are not recoverable for breach of contract except in those rare cases where the breach is accompanied by an independent tort.' " *Fix v. First State Bank of Roscoe*, 807 N.W.2d 612, 617 (S.D. 2011) (quoting *Long-Russell v. Hampe*, 39 P.3d 1015, 1019 (Wyo. 2002)). This general rule is supported by South Dakota's statute governing tort damages, SDCL § 21-3-1, which provides

"[f]or the breach of an obligation *not arising from contract*, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." In contrast, SDCL § 21-2-1, which governs what kinds of damages are generally available in breach of contract cases, provides:

> For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin.

In addition, consequential damages in breach of contract cases must be "reasonably foreseeable by the breaching party at the time of contracting." *Colton v. Decker*, 540 N.W.2d 172, 177 (S.D. 1995). The court is unaware of any South Dakota Supreme Court case that allows recovery of emotional damages in a pure breach of contract claim, nor have plaintiffs cited any.

While plaintiffs cite *Kunkel v. United Sec. Ins. Co. of N.J.*, 168 N.W.2d 723 (S.D. 1969), this case lends no support to plaintiffs' position. According to plaintiffs, *Kunkel* "has left the door open for emotional distress and similar types of damages to be recovered in an action that is essentially contractual." *See* Docket 18 at 28. But *Kunkel* involved a bad faith insurance claim. *See Kunkel*, 168 N.W.2d at 725. In deciding whether Kunkel was entitled to emotional damages, the South Dakota Supreme Court first discussed whether Kunkel's claim sounded solely as a breach of contract claim or whether the "gist" of the action was tortious. *See id.* at 733. This inquiry mattered because

48

consequential damages are more restricted in breach of contract cases as compared to those sounding in tort. *See id.*

The South Dakota Supreme Court did not expressly state Kunkel's claim could be evaluated under tort principles. *See id.* But in *Kunkel*, the Court appears to have found that a bad faith claim against an insurer for failure to settle is both a breach of contract and tort claim, because the Court cited two cases that both discussed bad-faith insurance claims as sounding under tort. *See id.* at 734 (citing *Crisci v. Sec. Ins. Co. of New Haven, Conn.*, 426 P.2d 173, 179 (Cal. 1967) and *State Farm Mut. Auto. Ins. Co. v. Smoot*, 381 F.2d 331, 338 (5th Cir. 1967)). To the extent *Kunkel* was unclear, the South Dakota Supreme Court confirmed this understanding in *Stene v. State Farm Mut. Auto. Ins. Co.*, 583 N.W.2d 399, 403 (S.D. 1998) ("An insurer's violation of its duty of good faith and fair dealing constitutes a tort, even though it is also a breach of contract.").

Unlike in *Kunkel*, where the plaintiff alleged a claim that sounded in tort and was also a breach of contract, Dr. Grevlos and Dr. Gresheim do not allege any independent tort, such as negligent or intentional infliction of emotional distress. *See Kunkel*, 168 N.W.2d at 733; *see generally* Docket 1; *see, e.g.*, *Nelson v. WEB Water Dev. Ass'n, Inc.*, 507 N.W.2d 691, 699 (S.D. 1993) (negligent infliction of emotional distress is a tort); *Harvey v. Reg'l Health Network, Inc.*, 906 N.W.2d 382, 394-95 (S.D. 2018) (intentional infliction of emotional distress is a tort). Thus, plaintiffs do not allege an independent tort that allows them to recover emotional distress damages. *See Fix*, 807 N.W.2d at

617. And as a result, the court grants defendant's motion, whether construed under a motion to strike or 12(b)(6) for failure to state a claim, with respect to plaintiffs' alleged emotional distress, degradation of character, and humiliation damages.

Turning to plaintiffs' requests for emotional, feelings of degradation, and humiliation damages for their ADEA age discrimination claims, the ADEA does not permit such damages. *See Maschka v. Genuine Parts Co.*, 122 F.3d 566, 573 (8th Cir. 1997) (citing *Glover v. McDonnell Douglas Corp.*, 981 F.2d 388, 395 (8th Cir. 1992)). Plaintiffs acknowledge these damages are unrecoverable. *See* Docket 18 at 29. Thus, the court grants the motion to strike this specific request for damages, whether construed under Rule 12(f) or 12(b)(6).

## III.  Conclusion

For the above reasons, it is ORDERED

1) That Augustana's motion to dismiss Dr. Grevlos's and Dr. Nesheim's retaliation claims is DENIED;

2) That the court gives Dr. Nesheim leave to amend paragraph 47 of his complaint to reflect that he filed his OCR complaint on January 4, 2022;

3) That Augustana's motion to dismiss Dr. Grevlos's sex discrimination claims is GRANTED IN PART AND DENIED IN PART. Specifically, the court does not dismiss Dr. Grevlos's sex discrimination claims with respect to her alleged removal as Department Chair, Director of Vocal Studies, Director of the Augustana Summer Music Camp, and

reduced salary. But the court dismisses Dr. Grevlos's sex discrimination claims with respect to her alleged removal as the Conductor of the Angelus Choir, Director of the Opera Theatre, and termination;

4) That Augustana's motion to dismiss Dr. Grevlos's age discrimination claims is GRANTED IN PART AND DENIED IN PART. Specifically, the court does not dismiss Dr. Grevlos's age discrimination claims with respect to Augustana's decision to remove her from being the Director of the Augustana Summer Music Camp. But the court dismisses the rest of Dr. Grevlos's age discrimination claims;

5) That Augustana's motion to dismiss Dr. Nesheim's age discrimination claims is GRANTED IN PART AND DENIED IN PART. Specifically, the court does not dismiss Dr. Nesheim's age discrimination claims regarding Augustana's decision to remove him from being the Director of Vespers and the Conductor of the Augustana Choir. But the court dismisses Dr. Nesheim's age discrimination claims regarding Augustana's decision to remove him from being the Director of Choral Activities and to terminate him;

6) That Augustana's motion to dismiss Dr. Grevlos's and Dr. Nesheim's breach of contract claims is DENIED;

7) That Augustana's motion for a more definitive statement under Federal Rule of Procedure 12(e) is DENIED;

8) And that Augustana's motion to strike under Federal Rule of

Procedure 12(f) or dismiss under Federal Rule of Procedure 12(b)(6)

with respect to certain damages requested by plaintiffs is GRANTED.

Dated December 22, 2023.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE